UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

LAND O'LAKES, INC.

        Plaintiff,                      Case No.: 06-C-692

    vs.

SUPERIOR SERVICE TRANSPORTATION
OF WISCONSIN, INC.,
GREAT WEST CASUALTY COMPANY,
RUNABOUT EXPRESS, INC. and
OWNER OPERATOR SERVICES, INC.

        Defendants.

---

**MEMORANDUM DECISION AND ORDER**

---

Plaintiff, Land O'Lakes, Inc. ("LOL"), brought this action to recover damages it claims it incurred when the truck carrying a shipment of butter from its facility in Wisconsin to its New Jersey customer crashed. The defendants include Superior Service Transportation of Wisconsin, Inc. ("Superior"), the trucking company with whom LOL has a contract for transportation of its products; Runabout Express, Inc. ("Runabout"), the trucking company that actually hauled the load; and Owner Operator Services, Inc. ("OOS"), Runabout's insurer. LOL claims that the two trucking companies are jointly and severally liable for the full value of the shipment under the Carmack Amendment to the Interstate Commerce Act (ICA), 49 U.S.C 14706. LOL has also asserted a state law claim for conversion against OOS for the amount OOS received as salvage for the butter. Federal jurisdiction exists under 28 U.S.C. §§ 1331 and 1367. The case is presently before the court

on LOL's motion for partial summary judgment. For the reasons that follow, LOL's motion will be denied.

## BACKGROUND

LOL is a Minnesota corporation that manufactures and sells dairy products. LOL operates Madison Dairy, a facility located in Monroe, Wisconsin, that produces butter. On June 10, 2004, LOL entered into a contract for the transportation of its products with Superior. Under the terms of the contract, Superior agreed to assume "the liability of an interstate motor common carrier pursuant to 49 U.S.C. § 14706 ("Carmack") as written and in effect as of the date of this Contract, regardless of whether the shipment is interstate or intrastate in nature." (Aff. of Paul Klosterman, Ex. 1 at ¶ 6.) The contract further provided:

> If branded or labeled goods are damaged, LOL may determine within its sole discretion, and not subject to a reasonableness standard, whether the goods may be salvaged, and if salvageable, the value of the salvage. Any salvage receipts will be credited against LOL's claim against Carrier.

(*Id.*)[1]

In March of 2005, LOL agreed to ship approximately 40,000 pounds of butter from its Madison Dairy plant to Costco Wholesale, FOB Costco's warehouse in New Jersey for $66,348.45. Madison Dairy assigned the transport to Superior, but Superior, through Town Center Logistics, Inc., brokered delivery of the shipment to Runabout. (Aff. of Tammie DeRemer, ¶¶ 2-3.) Leonard

---

[1] Despite this contractual language which seems to give LOL unfettered discretion to determine whether, and the extent to which, its goods are damaged, LOL does not assert such authority in this case. Presumably, this is because the Carmack Amendment preempts state law breach of contract claims, *Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 289 (7th Cir. 1997), and under the Carmack Amendment, recovery is limited to actual losses to property. *Id.* at 285-86.

Richardson, the president of Runabout, signed the bill of lading acknowledging receipt of the shipment at the Madison Dairy facility on March 18, 2005. (Aff. of Barb Pautsch, Ex. A.)

Richardson never delivered the butter to Costco's New Jersey warehouse. While enroute, he was involved in an accident in the State of Pennsylvania. The circumstances surrounding the accident are less than clear. According to Richardson's account, he was following a pick-up with a load of scrap metal in back when "he lost something out the truck and it went under my truck and as far as we can tell, my air tank got busted off, the valve assembly in my air tank was busted off and I lost my air pressure." (Aff. of Tony Kordus, Ex. 2, Richardson Dep. at 25.) Richardson claimed that he was going through hilly terrain at the time and had no choice but to take one of the truck runaways in order to stop. Apparently, the truck crashed, as Richardson claims he broke his back in three places and knocked some teeth out. He also states he was unable to get out of the cab after the accident and had to be removed with a stretcher and conveyed to the hospital by ambulance.[2] (*Id.* at 25-26.)

Despite the severity of the injuries Richardson sustained and the damage to his cab, the trailer portion of the truck came through with relatively minor damage. An insurance adjuster retained by OOS inspected the truck on March 24, 2005, and noted that, although dented, the trailer remained intact with the cooling unit operational. (Def. PFOF ¶ 14.) Upon inspecting the contents, the adjuster observed that the butter was still in its cardboard containers wrapped in plastic. Some

---

[2]Notwithstanding Richardson's story about scrap falling off the pick-up truck he was following, a State Trooper who inspected the vehicle after the crash, found that both brake lining pads at axle #3 and the left brake lining pad at axle # 5 were inadequate for safe stopping. The Trooper also found that the left brake on axle # 4 and the right brake on axle# 5 were out of adjustment. (Richardson Dep., Ex. 13.)

3

of the boxes were dented or deformed; much of it appeared to be in its original condition.[3] (Def. PFOF ¶ 15.) Since the packages were intact and the butter had not been exposed, OOS contacted Madison Dairy and requested that it take back its product for re-sale. Madison Dairy failed to respond to OOS's request, and OOS finally sold the butter as salvage for $29,101.25 after three weeks. OOS has retained the $29,101.25 in an interest-bearing account pending the outcome of the case.

In the meantime, Madison Dairy replaced the shipment to Costco and demanded payment by Superior and/or Runabout and OOS for the face amount of its invoice. When Superior and Runabout refused payment, LOL commenced this action in state court alleging that Superior and Runabout were liable under the Carmack Amendment for loss of its shipment of butter and that OOS was liable for conversion of the salvage value it had retained.

**ANALYSIS**

The Carmack Amendment to the Interstate Commerce Commission Act, 49 U.S.C. § 14706, preempts state common law remedies against common carriers for loss or damage to goods shipped in interstate commerce. The purpose of the Carmack Amendment is to "establish uniform federal guidelines designed in part to remove the uncertainty surrounding a carrier's liability when damage occurs to a shipper's interstate shipment." *Hughes v. United Van Lines, Inc.*, 829 F.2d 1407, 1415 (7th Cir.1987). In relevant part, it states:

> A carrier providing transportation or service . . . shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier and any other

---

[3]Counsel for Runabout and OOS failed to include in his submissions the portions of the depositions he claims support the specific facts proposed.

> carrier that delivers the property and is providing transportation or service . . . are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported in the United States . . . . Failure to issue a receipt or bill of lading does not affect the liability of a carrier.

49 U.S.C. § 14706(a)(1). The Supreme Court has held that the Carmack Amendment is a codification of the common-law rule that "a carrier, though not an absolute insurer, is liable for damage to goods transported by it unless it can show that the damage was caused by (a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or nature of the goods." *Miss. Pac. R.R. Co. v. Elmore & Stahl*, 377 U.S. 134, 138 (1964). To establish a prima facie case under the Carmack Amendment, a shipper must demonstrate (1) delivery of the shipment to the carrier in good condition; (2) loss or damage to the shipment; and (3) the amount of damages. Once a prima facie case is established, the burden of proof is upon the carrier to show both that it was free from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability. *Allied Tube & Conduit Corp. v. S. Pac. Transp. Co.*, 211 F.3d 367, 370-71 (7th Cir.2000).

In this case, LOL argues that the undisputed facts of the case establish that it is entitled to summary judgment on its Carmack Amendment claim against Superior and Runabout. LOL notes that it is undisputed that Superior agreed to provide the transportation, but then arranged, through Town Center Logistics, for Runabout to carry the load. The shipment was delivered in good condition to Runabout for transport to New Jersey on March 18, 2005, but never arrived. Richardson had an accident in Pennsylvania and was unable to complete the trip to Costco's New Jersey warehouse. The invoice to Costco establishes that the value of the butter was $66,348.45.

5

Thus, LOL argues that it is entitled to summary judgment against Superior and Runabout on its Carmack Amendment claim in the amount of $66,348.45.

As an initial matter, Superior argues that it is entitled to dismissal because the facts establish that LOL has no claim against it. Superior notes that it did not accept delivery of the butter, issue a bill of lading or provide the transport. The transport was brokered to Runabout by Town Center Logistics, who is not a party. Superior also notes that its contract with LOL allows brokering with LOL's consent and further provides that "[i]f CARRIER holds a broker's license granted by FWHA [Federal Highway Administration], every LOL shipment is deemed tendered to CARRIER in its capacity as a motor carrier under the Contract, and CARRIER is governed by all its rights and obligations hereunder, unless the parties otherwise agree in writing." (PFOF ¶5.) However, Superior does not hold a broker's license. Thus, Superior argues that even if it had brokered the transport to Runabout, it would not be liable. Based on these facts, Superior contends LOL's motion for summary judgment against it should be denied and the claim against it dismissed.

Liability under the Carmack Amendment, however, extends beyond the carrier who actually provides the transportation. It extends to any carrier "providing transportation or service." 49 U.S.C. § 14706(a)(1). While Superior may not have directly transported the shipment, it did arrange for Town Center to broker the transport to Runabout. The ICA defines a "motor carrier" as "a person providing motor vehicle transportation for compensation," 49 U.S.C. § 13102(12). The ICA further specifies that the term "transportation" includes "services related to that movement, including arranging for, receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, packing, unpacking, and interchange of passengers and property." 49 U.S.C. § 13102(23)(B). And under the terms of its contract with LOL, Superior was entitled to

6

payment for its services. Based on the undisputed facts of the case, the Court concludes that Superior was acting as a motor carrier for purposes of the Carmack Amendment. *See, e.g., Mach Mold, Inc. v. Clover Associates, Inc.*, 383 F. Supp.2d 1015, 1030 (N.D. Ill. 2005) ("Accordingly, if Clover had been authorized to transport the machine and accepted and legally bound itself to do so, it would not be a broker. . . . Instead, Clover would be acting as a "motor carrier" for the purposes of the ICA."). Superior's request for dismissal is therefore denied.

Turning to LOL's argument that the undisputed facts establish that it is entitled to judgment as a matter of law, Runabout first argues that a factual dispute precludes a finding at this stage of the proceeding that LOL delivered the shipment for transport in good condition. While Runabout does not suggest that the butter loaded onto its truck at Madison Dairy was defective, it claims that the truck was not sealed after the product was loaded. LOL's written policy requires that all shipments arriving at or leaving its facilities be sealed and provides that any load that arrives at a LOL receiving facility without a seal "subject to refusal." (Klosterman Aff., Ex. 1.) The policy also places primary responsibility for sealing the trailers on the shipper. (*Id.*) Because the Madison Dairy employee in charge of loading the butter onto Runabout's truck did not seal the load, Runabout argues that the shipment was worthless as soon as it left LOL's facility.

LOL's internal policy, however, does not alter the plain meaning of the law. If it did, Runabout would be liable regardless since the policy states that carriers should ensure that the trailer is sealed "for their own protection," and further provides:

> If there is any question at all about whether or not the load may have been tampered with in route, then the load will be refused, or received "on hold" pending disposition. In such a case, LOL will not be responsible for any freight charges, either in to or out of the receiving facility, and the carrier would be exposed to liability for any product lost as a result.

7

(Klosterman Aff., Ex. 1.) Under the Carmack Amendment, the shipper is required to establish that the shipment was delivered to the carrier is good condition; not that the load was sealed. A seal is intended to protect the shipment from tampering, but its absence does not mean that the shipment is contaminated or otherwise damaged.

But wholly apart from whether the load was sealed or not, LOL has offered little evidence to support its contention that the load was in good condition when delivered to Runabout. The record does reflect that in signing the bill of lading, Richardson expressly warranted "that to the best of the holder's knowledge, the property is in good order." (Aff. of Barb Pautsch, Ex. A.) Although this is some evidence that the goods were in good order at the point of origin, "a bill of lading, on its own, may not necessarily establish a prima facie case that an entire shipment was received in good order." *Allied Tube & Conduit Corp. v. S. Pac. Transp. Co.*, 211 F.3d 367, 371 (7th Cir.2000). Direct evidence of good delivery is often not available, but a shipper should at least offer evidence of its general procedures used in preparing goods for shipment so that the condition of the goods can be inferred. *Pharma Bio, Inc. v. TNT Holland Motor Express, Inc.*, 102 F.3d 914, 917 (7th Cir.1996). LOL's affidavits provide no such evidence here. Its failure to do so precludes summary judgment in its favor.

Runabout also claims that a factual dispute exists over whether and to what extent the shipment was damaged. It notes that approximately 20% of the load was deformed as a result of the crash, but the rest maintained its original shape and all of the butter remained unexposed, encased in the cardboard boxes in which it was originally packaged and wrapped in plastic. Runabout has also offered evidence that the refrigerator unit of the trailer continued to operate and

8

maintain the required temperature. In light of this evidence, Runabout argues that LOL's claim that the shipment was a total loss is in dispute and summary judgment would be inappropriate.

However, this argument ignores the fact that Runabout never delivered the shipment to the destination listed in the bill of lading. Where the evidence shows nondelivery of a shipment, the shipper's damages are the actual value, usually the fair market value, of the goods. *Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 287-88 (7th Cir. 1997) (noting that normal measure of damages under Carmack Amendment for undelivered goods is fair market value). Since Runabout never delivered the shipment to Costco as the bill of lading required, and LOL ended up shipping a replacement load, LOL's damages would appear to be the price Costco agreed to pay, namely, the $66,348.45 reflected in the invoice which represents the fair market value of the goods Runabout failed to deliver.

This does not mean however, that Runabout's argument over damages is irrelevant. The evidence cited by Runabout is relevant to Runabout's affirmative defense that LOL failed to mitigate its damages. As in any action for contract damages, a shipper is under a duty to take reasonable steps to reduce the amount of its loss. *Paper Magic Group, Inc. v. J.B. Hunt Transport, Inc.*, 318 F.3d 458, 461 (3d Cir.2003). Runabout argues the LOL's failure to respond in a timely manner to its request that LOL take back the load and re-sell all or part of it constitutes a failure on LOL's part to mitigate its damages. It notes that Madison Dairy frequently reuses butter that is crushed or squashed in its own warehouses and argues that, had it agreed to take the shipment back as OOS requested, it could have resold it for all or most of its full value. The duty to accept and mitigate is "predicated upon very practical considerations," namely the fact that a buyer/consignee (or, conversely, a seller/shipper/consignor) "will often be a dealer or trader in the type of goods

9

involved and thus may be in a much better position to dispose of those damaged goods than the carrier who is not in the business of buying and selling the type of goods involved." *Long Prarie Packing Co. v. Midwest Emery Freight System, Inc.*, 429 F.Supp. 201, 203 (D.Mass.1977).

LOL argues in response that its policy precludes it from accepting product that has been involved in an accident of this nature because of the risk of food contamination. *Citing Eastman Kodak Co. v. Westway Motor Freight, Inc.*, 949 F.2d 317 (10th Cir. 1991), LOL contends that it is entitled to protect its reputation and that of its product. In *Eastman Kodak*, a load of sensitized photographic material was damaged when the proper temperature was not maintained during shipment. The carrier argued that the district court had erred in calculating damages by crediting the salvage value of the film against the invoice instead of the price Kodak could have received if it had sold the film at a discounted price. The Tenth Circuit rejected the carrier's argument noting that it was the carrier's burden to prove that the shipper did not exercise reasonable diligence in mitigating its damages and that the shipper need only take reasonable steps under the circumstances of the particular case to mitigate its damages. *Id.* at 320. Because the record demonstrated that Kodak had spent considerable resources in developing its reputation in the marketplace and that Kodak's reputation could have been harmed if it was required to sell damaged merchandise in order to mitigate damages, the court concluded that it would be unreasonable to require Kodak to subject its reputation to potential harm in order to mitigate its damages. *Id.*

LOL argues that the same reasoning applies in this case. It notes that "we live in a time of biohazard when producers of food products must exercise remarkable care to ensure that products are not tampered with, contaminated with organisms, or otherwise become unsuitable for consumption." (Reply to Runabout, at 6) According to Madison Dairy's accounting manager,

10

> From my perspective, financial perspective, this product has been out of our control. It has been exposed to the elements, trailer was tipped over. The structural integrity of that trailer was compromised. I can't make guarantees that the product was secure, safe, free from infestation, free from individual contact. From a financial perspective, I can't compromise quality, reputation, with a potential product safety incident.

(Aff. of Tony Kordus, Ex. 4, Dep. of Tate Grimm at 79.) Under these circumstances, LOL argues that its refusal to re-sell the product after it left its facility was reasonable. To do so would risk significant harm both to the public and to its own reputation.

The question raised by Runabout, however, is not whether LOL is entitled to take reasonable steps to protect the public and its own reputation. Clearly, it is. The question here is whether LOL's rejection of OOS's request was reasonable. If the facts recited by Madison Dairy's accounting manager were undisputed, LOL's decision not to accept return of the butter would clearly have been reasonable. But those facts are in dispute. Runabout has offered evidence that the only damage that occurred to the shipment was that roughly 20% of the load was deformed. It claims that none of the butter was exposed and the trailer remained intact with its refrigerator unit working. There is no evidence that the trailer tipped over. It appears more likely that when the cab came to a quick stop, the trailer crashed into the back of it. The facts here are significantly different than in *Eastman Kodak,* where there was no dispute as to the condition of the film. When the trailer was opened in that case, the temperature inside was well above fifty degrees Fahrenheit and most of the photographic material was destroyed. 949 F.2d at 319. Here, there is evidence that the proper temperature was maintained and the butter remained unexposed in its original packaging.

Based on this evidence, a jury could find that most of the butter was not damaged at all in the accident and the 20% that was deformed could have been resold at or near the market price. If

11

despite this fact, LOL elected for policy reasons or otherwise to reship a fresh load out of an overabundance of caution and in the absence of a genuine risk to either the public or its reputation, a factfinder could reasonably conclude that it failed to mitigate its damages. The record is not sufficiently clear to permit a determination of this issue as a matter of law. Accordingly, for this reason, as well, summary judgment is not warranted.

**IT IS THEREFORE ORDERED** that LOL's motion for partial summary judgment is **DENIED**. The clerk shall set this matter for a Rule 16 telephone conference so a trial date can be set.

Dated this   27th   day of June, 2007.

        s/ William C. Griesbach
William C. Griesbach
United States District Judge